# LUCAS COUNTY COMMON PLEAS COURT
## CASE DESIGNATION

TO:   **Bernie Quilter, Clerk of Courts**

**CASE NO.**_____

**JUDGE**

> G-4801-CI-0202102854-000
> Judge
> **MICHAEL R GOULDING**

Exhibit B

**The following type of case is being filed:**

**Professional Malpractice**
- [ ] Legal Malpractice (L)
- [ ] Medical Malpractice (M)
- [ ] **Product Liability (B)**
- [ ] **Other Tort (C)**

**Workers' Compensation**
- [ ] State Funded (D)
- [ ] Self Insured (K)

- [ ] **Administrative Appeal (F)**

- [ ] **Commercial Docket**

By submitting the complaint, with the signature of the Attorney, the Attorney affirms that the name of person with settlement authority and his/her direct phone number will be provided upon request to a party or counsel in this matter

**Other Civil**
- [ ] Consumer Fraud (N)
- [ ] Appropriation (P)
- [✓] Other Civil (H)
- [ ] Copyright Infringement (W)
- [ ] Forfeiture
- [ ] Court Ordered
- [ ] Certificate of Title

This case was previously dismissed pursuant to CIVIL RULE 41 and is to be assigned to Judge _____, the original Judge at the time of dismissal. The previously filed case number was CI_____.

This case is a civil forfeiture case with a criminal case currently pending. The pending case number is_____, assigned to Judge _____

This case is a Declaratory Judgment case with a personal injury or related case currently pending. The pending case number is_____, assigned to Judge _____

This case is to be reviewed for consolidation in accordance with Local Rule 5.02 as a companion or related case. This designation sheet will be sent by the Clerk of Courts to the newly assigned Judge for review with the Judge who has the companion or related case with the lowest case number. The Judge who would receive the consolidated case may accept or deny consolidation of the case. Both Judges will sign this designation sheet to indicate the action taken. If the Judge with the lowest case number agrees to accept, the reassignment of the case by the Administration Judge shall be processed. If there is a disagreement between the Judges regarding consolidation, the matter may be referred to the Administrative Judge.

Related/companion case number_____ Assigned Judge_____

_____   _____
Approve/Deny                Date      Approve/Deny              Date

**Attorney**      Brian D. Spitz (0068816)
**Address**       THE SPITZ LAW FIRM, LLC 25200 Chagrin Boulevard, Suite 200
                  Beachwood, OH 44122
**Telephone**     (216) 291-4744

EFILED LUCAS COUNTY
08/26/2021 08:55 AM
COMMON PLEAS COURT
BERNIE QUILTER, CLEI
efile id 78330

## IN THE COURT OF COMMON PLEAS
## LUCAS COUNTY, OHIO

JACQUELINE MARS )  CASE
1109 Sherman Street )
Toledo, Ohio 43608 )  JUDG
)
                 Plaintiff, )
)
      v. )
)
DANA, INC. )
3044 Jeep Parkway )
Toledo, Ohio 43610 )
)
   **Serve also:** )
   CT CORPORATION SYSTEM )
   Statutory Agent )
   4400 Easton Commons Way, # 125 )
   Columbus, Ohio 43219 )
)
             Defendant. )

**G-4801-CI-0202102854-000**
**Judge**
**MICHAEL R GOULDING**

**COMPLAINT FOR DAMAGES
AND REINSTATEMENT**

**JURY DEMAND ENDORSED
HEREIN**

     Plaintiff, Jacqueline Mars, by and through undersigned counsel, as her Complaint against the Defendant, states and avers the following:

### PARTIES AND VENUE

1.   Mars is a resident of the city of Toledo, county of Lucas, state of Ohio.

2.   Dana, Inc. is a foreign corporation that conducts substantial business at 3044 Jeep Parkway, Toledo, Ohio 43610.

3.   The conduct giving rise to the allegations in this Complaint occurred in Toledo, Ohio.

4.   Therefore, personal jurisdiction is proper over Defendants pursuant to R.C. § 2307.382(A)(1) and (4).

5.   Venue is proper pursuant to Civ. R. 3(C)(3) & (6).

The Employee's Attorney.™



6.  Within 300 days of the conduct alleged below, Mars filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 471-2021-00542 against Dana.

7.  On June 2, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Mars regarding the Charges of Discrimination brought by Mars against Acme in EEOC Agency Charge No. 471-2021-00542.

8.  Mars received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) and 42 U.S.C. § 12117 which has been attached hereto as Plaintiff's Exhibit A.

9.  Mars has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

10. Mars has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

11. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

12. Mars is a former employee of Dana.

13. Mars began working for Dana in or around July 2018.

14. Mars worked for Dana as an assembly technician.

15. Mars is African American.

16. Mars has a shoulder injury. ("Shoulder Injury")

17. Mars' Shoulder Injury substantially impacts one or more major life activities, including working.

The Employee's Attorney.™



18. Mars' Shoulder Injury substantially impacts one or more major life activities, including the ability to lift certain objects.

19. Mars was given intermittent leave under the Family and Medical Leave Act of 1993, to 29 U.S.C. §§ 2601 *et seq.* ("Intermittent FMLA Leave")

20. Mars qualified for the Intermittent FMLA Leave because of her Shoulder Injury.

21. Dana become aware of Mars' Shoulder Injury after Mars utilized her Intermittent FMLA Leave.

22. Because of her Shoulder Injury, Mars is and was considered disabled under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

23. Alternatively, Dana perceived Mars as disabled.

24. Alternatively, Dana perceived Mars' Shoulder Injury as constituting a physical impairment.

25. Despite Mars' Should Injury, Mars was able to perform the essential functions of her job, with or without a reasonable accommodation.

26. Throughout her employment at Dana, Mars was subjected to unwanted discrimination and harassment on the basis of her race and disability and/or perceived disability and/or perceived disabling condition.

27. On or about February 1, 2020, Mars was working with Jaylon Last Name Unknown ("LNU"), who is a team lead.

28. Jaylon LNU is Caucasian.

29. February is Black History Month.



30. On or about February 1, 2020, Jaylon LNU said to Mars that she should "be happy with this one month because we (sic) get eleven." ("February 1, 2020 Black History Month Comment")

31. The February 1, 2020 Black History Month Comment was made in reference to the fact that February is Black History Month.

32. By saying that Mars should "be happy with one month because we (sic) get eleven," during the February 1, 2020 Black History Month Comment, Jaylon LNU was explaining that African American people only deserve recognition and equality during one month of the year, while Caucasian people are entitled to superiority for the remaining eleven months of the year.

33. The February 1, 2020 Black History Month Comment was because of Mars' race.

34. The February 1, 2020 Black History Month Comment was unwanted by Mars.

35. Mars opposed the February 1, 2020 Black History Month Comment.

36. Mars was embarrassed by the February 1, 2020 Black History Month Comment.

37. Mars was offended by the February 1, 2020 Black History Month Comment.

38. A reasonable person would consider the February 1, 2020 Black History Month Comment to be severe and/or pervasive.

39. The February 1, 2020 Black History Month Comment constituted harassment.

40. The February 1, 2020 Black History Month Comment created a hostile work environment.

41. Mars reported the February 1, 2020 Black History Month Comment to her superiors. ("February 1, 2020 Racism Complaint")

42. Mars made the February 1, 2020 Racism Complaint to her supervisor, Don Last Name Unknown.



43. Don LNU is Caucasian.

44. Mars made the February 1, 2020 Racism Complaint to Megan Parsons, who is Dana's Human Resources Manager in Toledo, Ohio.

45. Parsons is Caucasian.

46. Mars made the February 1, 2020 Racism Complaint to Mark Popovich, who is the union representative for the United Auto Workers ("UAW") Local 12, the union that Dana's employees belonged to.

47. Popovich is Caucasian.

48. Based on Dana's policies, the February 1, 2020 Racism Complaint was considered a significant workplace event.

49. Dana has a policy of investigating significant workplace events.

50. Based on his status as a supervisor for Dana, Don LNU was under the obligation to prompt an investigation of the February 1, 2020 Racism Complaint.

51. Based on her role at Dana, Parsons was under an obligation to conduct an investigation into the February 1, 2020 Racism Complaint.

52. Based on his role at Dana and for UAW Local 12, Popovich was under an obligation to prompt an investigation into the February 1, 2020 Racism Complaint.

53. An investigation should include interviewing the complainant.

54. An investigation should include interviewing the subject of the complaint.

55. An investigation should include interviewing the subject of the reported discrimination.

56. An investigation should include interviewing witnesses to the reported discrimination.

57. An investigation should include getting a written statement from the complainant.

58. An investigation should include getting a written statement from the subject of the complaint.



59. An investigation should include getting a written statement from the subject of the reported discrimination.

60. In response to the February 1, 2020 Racism Complaint, Dana did not interview Mars.

61. In response to the February 1, 2020 Racism Complaint, Dana did not interview Jaylon LNU.

62. In response to the February 1, 2020 Racism Complaint, Dana did not interview any witnesses.

63. In response to the February 1, 2020 Racism Complaint, Dana did not get a written statement from Mars.

64. In response to the February 1, 2020 Racism Complaint, Dana did not get a written statement from Jaylon LNU.

65. In response to the February 1, 2020 Racism Complaint, Dana did not get a written statement from any witnesses.

66. In response to the February 1, 2020 Racism Complaint, Dana conducted no investigation whatsoever.

67. By failing to investigate the February 1, 2020 Racism Complaint, Dana ratified Jaylon LNU's conduct.

68. By failing to investigate the February 1, 2020 Racism Complaint, Dana allowed Jaylon LNU's conduct to continue.

69. Failing to investigate a report of racial harassment is an adverse action.

70. Failing to investigate a report of racial harassment is an adverse employment action.

71. Dana willfully failed to investigate the February 1, 2020 Racism Complaint.

72. Dana intentionally failed to investigate the February 1, 2020 Racism Complaint.



73. Rather than investigate the February 1, 2020 Racism Complaint, Popovich told Mars that Jaylon LNU was "just a kid" and that Jaylon LNU was "just playing." ("Condoning Racist Comments")

74. Popovich's Condoning Racist Comments was an admission that Dana would not and/or did not take Mars' February 1, 2020 Racism Complaint seriously.

75. Following the February 1, 2020 Racism Complaint, Mars continued to suffer racial harassment.

76. On or about April 14, 2020, Mars was told by Matt O'Neil, a plant manager for Dana, to put her hair up. ("April 14, 2020 Put-Your-Hair-Up Comment")

77. O'Neil is Caucasian.

78. O'Neil did not tell similarly situated Caucasian employees to wear their hair "up" while working.

79. O'Neil made the April 14, 2020 Put-Your-Hair-Up Comment because of Mars' race.

80. The April 14, 2020 Put-Your-Hair-Up Comment was unwanted by Mars.

81. Mars opposed the April 14, 2020 Put-Your-Hair-Up Comment.

82. Mars was embarrassed by the April 14, 2020 Put-Your-Hair-Up Comment.

83. Mars was offended by the April 14, 2020 Put-Your-Hair-Up Comment.

84. A reasonable person would consider the April 14, 2020 Put-Your-Hair-Up Comment to be severe and/or pervasive.

85. constituted harassment.

86. The April 14, 2020 Put-Your-Hair-Up Comment created a hostile work environment.



87. In response to the April 14, 2020 Put-Your-Hair-Up Comment, Mars told O'Neil that he was being racist and discriminatory. ("Opposing the April 14, 2020 Put-Your-Hair-Up Comment")

88. In response to Mars' Opposing the April 14, 2020 Put-Your-Hair-Up Comment, O'Neil told Mars that she still needed to wear her hair "up" and that she could take up any problems with HR. ("April 14, 2020 Go-To-HR Comment")

89. O'Neil made the April 14, 2020 Go-To-HR Comment knowing that Mars had previously made a protected complaint of racism to HR.

90. O'Neil was being facetious in making the April 14, 2020 Go-To-HR Comment because he knew that it would not result in discipline.

91. O'Neil made the April 14, 2020 Go-To-HR Comment to further humiliate Mars.

92. As a result of the April 14, 2020 Go-To-HR Comment, Mars was required to continue wearing her hair "up" while similarly situated Caucasian employees did not.

93. As a result of the April 14, 2020 Go-To-HR Comment, Mars was treated less favorably than similarly situated Caucasian employees.

94. The April 14, 2020 Go-To-HR Comment would make it less likely for a reasonable employee to oppose discrimination and/or harassment on the basis of race.

95. O'Neil made the April 14, 2020 Go-To-HR Comment because Mars opposed discriminatory conduct.

96. The April 14, 2020 Go-To-HR Comment was an adverse action.

97. The April 14, 2020 Go-To-HR Comment was an adverse employment action.

98. The April 14, 2020 Go-To-HR Comment was willful.

99. The April 14, 2020 Go-To-HR Comment was intentional.



100. The April 14, 2020 Go-To-HR Comment constitutes discrimination.

101. The April 14, 2020 Go-To-HR Comment constitutes retaliation.

102. Beginning in or around March 2020, due to the emerging COVID-19 pandemic, non-essential businesses began closing or transitioning to remote work.

103. On or around March 12, 2020, the Ohio Department of Health issued an order to avoid mass-gatherings. ("No Mass-Gathering Order")

104. In the No Mass-Gathering Order, the Ohio Department of Health urged individuals to:

> [M]aintain social distancing (approximately six feet away from other people) whenever possible and to continue to wash hands, utilize hand sanitizer and practice proper respiratory etiquette (coughing into elbow, etc.)

105. On or around March 22, 2020, the Ohio Department of Health issued a stay-at-home order, requiring individuals, particularly those with COVID-19 symptoms, to self-isolate. ("Government Mandate")

106. The Government Mandate was in accordance with emergency powers granted to the Ohio Department of Health in Executive Order 2020-01D.

107. The Government Mandate ordered businesses and employers to take actions including to:

> Actively encourage sick employees to stay home until they are free of fever (without the use of medication) for at least 72 hours (three full days) AND have improved for at least 72 hours AND at least seven days have passed since first began. Do not require a healthcare provider's note to validate the illness or return to work of employees sick with acute respiratory illness; healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

108. The Government Mandate ordered businesses and employers to take actions, including to:

> Ensure that your sick leave policies are up to date, flexible, and non-punitive to allow sick employees to stay home to care for themselves, children, or other family members. Consider encouraging employees to do a self-assessment each day to check if they have any (fever, cough, or shortness of breath).

109. The Government Mandate urged at-risk individuals to take precautions regarding their health:

The Employee's Attorney.™



> People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care.

110. The Government Mandate required businesses to observe social-distancing requirements:

> Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces. and not shaking hands.

111. The Government Mandate was made pursuant to R.C. § 3701.13, which reads in part:

> The department of health shall have supervision of all matters relating to the preservation of the life and health of the people and have ultimate authority in matters of quarantine and isolation, which it may declare and enforce, when neither exists, and modify, relax, or abolish, when either has been established.

112. R.C. §3701.352 states, "No person shall violate any rule the director of health or department of health adopts or any order the director or department of health issues under this chapter to prevent a threat to the public caused by a pandemic, epidemic, or bioterrorism event."

113. Clear public policy exists if the policy was manifested in a state or federal constitution, statute, ordinance, or administrative regulation, or in the common law.

114. The Revised Code comprises state statutes.

115. There is a clear public policy in adhering to orders of the director of health or department of health.

116. On or around July 30, 2020, a Dana employee became ill and vomited while working in close proximity to Mars. ("July 30, 2020 Sick-Employee Incident")

117. At the time of the July 30, 2020 Sick-Employee Incident, the Government Mandate and No Mass Gathering Order were in effect.

118. At the time of the July 30, 2020 Sick-Employee Incident, there was a clear public policy that required employers to take all steps reasonably necessary to stop the spread of disease.

The Employee's Attorney.™



119. At the time of the July 30, 2020 Sick-Employee Incident, Dana had a policy under which it would close down the "line" if an employee became ill while working on said line. ("Clean-the-Line Policy")

120. Based on the July 30, 2020 Sick-Employee Incident, Dana's Clean-the-Line Policy required Dana to shut down the line and send the employees on that line home, including Mars.

121. Based on the July 30, 2020 Sick-Employee Incident, Dana's Clean-the-Line Policy required Dana to shut down the line and have it disinfected.

122. During the July 30, 2020 Sick-Employee Incident, Dana did not adhere to the Clean-the-Line Policy.

123. During the July 30, 2020 Sick-Employee Incident, Dana did not send Mars home, even though it was supposed to do so under its Clean-the-Line Policy.

124. During the July 30, 2020 Sick-Employee Incident, Dana did not disinfect the work area, even though it was supposed to do so under its Clean-the-Line Policy.

125. In response to Dana's refusal to send Mars home during the July 30, 2020 Sick-Employee Incident, Mars questioned Justin Walker, Dana's safety supervisor, about why he refused to follow the Clean-the-Line Policy. ("July 30, 2020 Unsafe Work Environment Complaint")

126. Mars made the July 30, 2020 Unsafe Work Environment Complaint because she feared for her health and wellbeing.

127. In making the July 30, 2020 Unsafe Work Environment Complaint, Mars expressed that she thought Walker's inaction jeopardized workplace safety.



128. In response to Mars' July 30, 2020 Unsafe Work Environment Complaint, Walker called Mars "ignorant." ("Calling Mars Ignorant")

129. Walker's Calling Mars Ignorant was because of Mars' race.

130. Walker's Calling Mars Ignorant was unwanted by Mars.

131. Mars opposed Walker's Calling Mars Ignorant.

132. Mars was embarrassed by Walker's Calling Mars Ignorant.

133. Mars was offended by Walker's Calling Mars Ignorant.

134. A reasonable person would consider Walker's Calling Mars Ignorant to be severe and/or pervasive.

135. Walker's Calling Mars Ignorant constituted harassment.

136. Walker's Calling Mars Ignorant created a hostile work environment.

137. Walker did not call similarly situated Caucasian employees ignorant.

138. In Calling Mars Ignorant, Walker treated Mars less favorably than similarly situated Caucasian employees.

139. Walker's Calling Mars Ignorant was an adverse action.

140. Walker's Calling Mars Ignorant was an adverse employment action.

141. Walker's Calling Mars Ignorant constitutes discrimination on the basis of race.

142. In response to Walker's Calling Mars Ignorant and Walker's inaction on the July 30, 2020 Unsafe Work Environment Complaint, Mars reported Walker to Parsons. ("July 30, 2020 HR Complaint")

143. During the July 30, 2020 HR Complaint, Mars reported the July 30, 2020 Unsafe Work Environment Complaint and Walker's inaction.

144. During the July 30, 2020 HR Complaint, Mars reported Walker's Calling Mars Ignorant.



145. Based on Dana's policies, the July 30, 2020 HR Complaint was considered a significant workplace event.

146. In response to the July 30, 2020 HR Complaint, Dana did not interview Mars.

147. In response to the July 30, 2020 HR Complaint, Dana did not interview Walker.

148. In response to the July 30, 2020 HR Complaint, Dana did not interview any witnesses.

149. In response to the July 30, 2020 HR Complaint, Dana did not get a written statement from Mars.

150. In response to the July 30, 2020 HR Complaint, Dana did not get a written statement from Walker.

151. In response to the July 30, 2020 HR Complaint, Dana did not get a written statement from any witnesses.

152. In response to the July 30, 2020 HR Complaint, Dana conducted no investigation whatsoever.

153. By failing to investigate the July 30, 2020 HR Complaint, Dana ratified Walker's conduct.

154. By failing to investigate the July 30, 2020 HR Complaint, Dana allowed Walker's conduct to continue.

155. Failing to investigate a report of racial harassment is an adverse action.

156. Failing to investigate a report of racial harassment is an adverse employment action.

157. Failing to investigate a report of an unsafe work environment is an adverse action.

158. Failing to investigate a report of an unsafe work environment is an adverse employment action.

159. Dana willfully failed to investigate the July 30, 2020 HR Complaint.

160. Dana intentionally failed to investigate the July 30, 2020 HR Complaint.



161. R.C. § 4101.11 provides that "[e]very employer shall furnish employment which is safe for the employees engaged therein," and "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe…"

162. R.C. § 4101.12 provides that "No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe."

163. R.C. § 4101.12 further provides that "No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters."

164. R.C. § 4101.12 further provides that "No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe."

165. Section 34 of Article II of the Ohio Constitution provides: "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of the constitution shall impair or limit this power."

166. By providing that "[e]very employer shall furnish employment which is safe for the employees engaged therein," and "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe…" R.C. § 4101.11 manifests a clear public policy favoring workplace safety.

167. By providing that "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail



to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe," R.C. § 4101.12 manifests a clear public policy favoring workplace safety.

168. By providing that "[n]o employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters," R.C. § 4101.12 manifests a clear public policy favoring workplace safety.

169. By providing that "No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe," R.C. § 4101.12 manifests a clear public policy favoring workplace safety.

170. By providing "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of the constitution shall impair or limit this power" Section 34 of Article II of the Ohio Constitution manifests a clear public policy favoring workplace safety.

171. The federal Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, was enacted, in part, because "Congress finds that personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments."

172. 29 U.S.C. § 651 provides that "Congress declares it to be its purpose and policy, through the exercise of its powers to regulate commerce among the several States and with foreign nations and to provide for the general welfare, to assure so far as possible every working man



and woman in the Nation safe and healthful working conditions and to preserve our human resources."

173. 29 U.S.C. § 651 intends to assure "safe and healthful working conditions" by "encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions."

174. 29 U.S.C. § 651 intends to assure "safe and healthful working conditions" by "providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions."

175. 29 U.S.C. § 651 intends to assure "safe and healthful working conditions" by "building upon advances already made through employer and employee initiative for providing safe and healthful working conditions."

176. 29 U.S.C. § 651 manifests a clear public policy favoring workplace safety.

177. 29 U.S.C. § 654(a) provides that "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

178. By providing that "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees," 29 U.S.C. § 654(a) manifests a clear public policy favoring workplace safety.

179. There is a clear public policy embodied in Ohio law that favors workplace safety.

The Employee's Attorney.™



180. Terminating an employee for raising complaints about workplace safety jeopardize the Ohio public policy that favors workplace safety.

181. Dana's failure to ensure a safe work environment is in violation of Ohio public policy as recognized by the Ohio Supreme Court: "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." *Pytlinski v. Brocar Prod., Inc.,* 2002-Ohio-66, 94 Ohio St. 3d 77, 80, 760 N.E.2d 385, 388 (2002)

182. After Mars made the July 30, 2020 HR Complaint, Mars returned to work until her Shoulder Injury began to bother her. ("July 30, 2020 Shoulder Injury Flare Up")

183. During the July 30, 2020 Shoulder Injury Flare Up, Mars' Shoulder Injury became so painful that Mars needed to take her Intermittent FMLA Leave.

184. At the time of the July 30, 2020 Shoulder Injury Flare Up, Mars had not used all of her Intermittent FMLA Leave.

185. At the time of the July 30, 2020 Shoulder Injury Flare Up, Mars was permitted to utilize her Intermittent FMLA Leave.

186. During the July 30, 2020 Shoulder Injury Flare Up, Mars advised her supervisor that she was intending to use her Intermittent FMLA Leave. ("Notifying Supervisor of Need for FMLA Leave")

187. In Notifying Supervisor of Need for FMLA Leave, Mars was seeking an accommodation for her Shoulder Injury.

188. Mars' Intermittent FMLA Leave was a reasonable accommodation for Mars' Shoulder Injury.



189. By utilizing her Intermittent FMLA Leave during the July 30, 2020 Shoulder Injury Flare Up, Mars would impose no undue hardship on Dana.

190. Dana has no contemporaneously created documentation concerning whether Mars' using Intermittent FMLA Leave during the July 30, 2020 Shoulder Injury Flare Up would cause an undue hardship.

191. By Notifying Supervisor of Need for FMLA Leave, Mars was making a reasonable accommodation request.

192. In Notifying Supervisor of Need for FMLA Leave, Mars was complying with the procedure for invoking her Intermittent FMLA Leave.

193. In response to Mars' Notifying Supervisor of Need for FMLA Leave, Mars' supervisor permitted Mars to utilize her Intermittent FMLA Leave.

194. After Mars used Intermittent FMLA Leave on or about July 30, 2020, Mars was terminated. ("Termination")

195. Mars was not told that she was going to be terminated if she used her Intermittent FMLA Leave.

196. By performing the Termination, Dana denied Mars' accommodation request without engaging in an interactive process.

197. Mars was told that she was terminated for leaving work. ("Stated Basis for Termination")

198. At the time of her Termination, Mars complied with all the procedures for invoking her Intermittent FMLA Leave and was permitted to do so.

199. Dana has a progressive discipline policy that that calls for escalating levels of discipline for disciplinary infractions, beginning with a verbal warning, followed by a written warning, and ultimately leading up to termination.

The Employee's Attorney.™



200. Mars did not receive a verbal warning.

201. Mars did not receive a written warning.

202. Mars did not receive a second written warning.

203. Dana did not discipline Mars whatsoever.

204. Skipping steps in a progressive discipline policy is an adverse action.

205. Skipping steps in a progressive discipline policy is an adverse employment action.

206. Dana willfully skipped steps in its progressive discipline policy in performing the Termination.

207. Dana intentionally skipped steps in its progressive discipline policy in performing the Termination.

208. The Stated Basis for Termination has no basis in fact.

209. The Stated Basis for Termination did not actually motivate Mars' Termination.

210. There is a causal connection between Mars' race and her Termination.

211. There is a causal connection between Mars' disability, perceived disability, and/or perceived disabling condition and her Termination.

212. There is a causal connection between Mars' taking leave under the FMLA and her Termination.

213. There is a causal connection between Mars' making protected complaints and her Termination.

214. Mars was terminated because of her race.

215. Alternatively, Mars was terminated because of her Shoulder Injury.

216. Alternatively, Mars was terminated because she used her Intermittent FMLA Leave.

217. Alternatively, Mars was terminated because of the February 1, 2020 Racism Complaint.



218. Alternatively, Mars was terminated because of her Opposing the April 14, 2020 Put-Your-Hair-Up Comment.

219. Alternatively, Mars was terminated because of the July 30, 2020 HR Complaint.

220. The Stated Basis for Termination is pretext for discrimination on the basis of race.

221. The Stated Basis for Termination is pretext for discrimination on the basis of disability, perceived disability, or perceived disabling condition.

222. The Stated Basis for Termination is pretext for retaliation for Mars' opposing unlawful discrimination.

223. The Stated Basis for Termination is pretext for retaliation in violation of public policy.

224. The Stated Basis for Termination is pretext for retaliation in violation of the FMLA.

225. Mars' Termination made it less likely for reasonable employees to report unsafe working conditions.

226. Mars' Termination made it less likely for reasonable employees to ensure compliance with the Government Mandate.

227. Mars' Termination made it less likely for reasonable employees to reduce and/or mitigate against the spread of COVID-19.

228. Mars' Termination was motivated by conduct related to the clear public policy favoring workplace safety.

229. Dana had no overriding justification for performing Mars' Termination.

230. As a direct and proximate result of Defendant's conduct, Mars suffered and will continue to suffer damages, including economic and emotional distress damages.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

231. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.



232. As an African American, Mars is a member of a statutorily protected class under 42 U.S.C. §§ 2000e *et seq.*

233. Throughout her employment, Mars was treated less favorably than similarly situated Caucasian employees because of her race.

234. Dana took adverse actions and adverse employment actions against Mars because of her race.

235. Dana's actions amount to discrimination on the basis of race in violation of 42 U.S.C. §§ 2000e *et seq.*

236. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 2000e *et seq.*, Mars has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Mars to injunctive, equitable, and compensatory monetary relief.

237. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 2000e *et seq.*, Mars has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering, and physical injury.

238. In its discriminatory actions as alleged above, Dana acted with malice or reckless indifference to the rights of Mars, thereby entitling Mars to an award of punitive damages.

239. To remedy the violations of the rights of Mars secured by under 42 U.S.C. §§ 2000e *et seq.*, Mars requests that the Court award her the relief demanded below.

**COUNT II: DISABILITY DISCRIMINATION UNDER 42 U.S.C. §§ 12101 ET SEQ.**

240. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

241. Because of Mars' Shoulder Injury, Mars was a member of a protected class under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

242. Throughout Mars' employment, Mars was treated less favorably than similarly situated employees because of her disability, perceived disability, and/or perceived disabling condition.

243. Dana took adverse employment actions against Mars because of her disability, perceived disability, and/or perceived disabling condition.

244. Dana's actions amount to discrimination on the basis of disability, perceived disability, and/or perceived disabling condition in violation of 42 U.S.C. §§ 12101 *et seq.*

245. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 12101 *et seq.*, Mars has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Mars to injunctive, equitable, and compensatory monetary relief.

246. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 12101 *et seq.*, Mars has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering, and physical injury.

247. In its discriminatory actions as alleged above, Dana acted with malice or reckless indifference to the rights of Mars, thereby entitling Mars to an award of punitive damages.

248. To remedy the violations of the rights of Mars secured by under 42 U.S.C. §§ 12101 *et seq.*, Mars requests that the Court award her the relief demanded below.

**COUNT III: DISABILITY DISCRIMINATION—FAILURE TO ACCOMMODATE**

▮. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

250. Because of Mars' Shoulder Injury, Mars was a member of a protected class under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

251. Despite Mars' Shoulder Injury, Mars would have been able to perform the essential job functions with or without a reasonable accommodation.

252. In asking to use her Intermittent FMLA Leave, Mars was asking for an accommodation for her Shoulder Injury.

253. Mars' accommodation request was reasonable.

254. Dana failed to engage in an interactive process with Mars to determine whether her accommodation request was reasonable.

255. Dana has no contemporaneously created documents that evidence that Mars' accommodation request would impose an undue hardship on Dana.

256. Dana has no contemporaneously created documents that evidence that Dana took any steps to determine whether Mars' accommodation request was reasonable.

257. In terminating Mars, Dana denied Mars a reasonable accommodation without engaging in an interactive process.

258. Dana's actions amount to discrimination on the basis of disability, perceived disability, and/or perceived disabling condition in violation of 42 U.S.C. §§ 12101 *et seq.*

259. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 12101 *et seq.*, Mars has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Mars to injunctive, equitable, and compensatory monetary relief.

260. As a result of Dana's discrimination against Mars in violation of under 42 U.S.C. §§ 12101 *et seq.*, Mars has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering, and physical injury.



261. In its discriminatory actions as alleged above, Dana acted with malice or reckless indifference to the rights of Mars, thereby entitling Mars to an award of punitive damages.

262. To remedy the violations of the rights of Mars secured by under 42 U.S.C. §§ 12101 *et seq.*, Mars requests that the Court award her the relief demanded below.

### COUNT IV: RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e–3

263. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

264. As an African American, Mars is a member of a protected class.

265. During her employment, Mars was subjected to unlawful discriminatory treatment on the basis of her race as alleged above.

266. Mars opposed the unlawful discriminatory treatment by making protected complaints to her supervisors.

267. Mars opposed the unlawful discriminatory treatment by informing Dana's employees of their respective discriminatory actions and asking them to stop.

268. In response to Mars' February 1, 2020 Racism Complaint, Opposing the April 14, 2020 Put-Your-Hair-Up Comment, and July 30, 2020 HR Complaint, Dana took retaliatory adverse actions against Mars.

269. Under 42 U.S.C. § 2000e–3(a), it is unlawful for "an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.



270. By retaliating against Mars for making the February 1, 2020 Racism Complaint, Opposing the April 14, 2020 Put-Your-Hair-Up Comment, and July 30, 2020 HR Complaint, Acme violated 42 U.S.C. § 2000e–3(a).

271. As a result of Defendants' retaliation against Mars in violation of R42 U.S.C. § 2000e–3(a), Mars has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Mars to injunctive, equitable, and compensatory monetary relief.

272. As a result of Defendants' retaliation against Mars in violation of 42 U.S.C. § 2000e–3(a), Mars has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering, and physical injury.

273. In its retaliatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Mars, thereby entitling Mars to an award of punitive damages.

274. To remedy the violations of the rights of Mars secured by 42 U.S.C. § 2000e–3(a), Mars requests that the Court award her the relief demanded below.

## COUNT V: RETALIATION IN VIOLATION OF THE FMLA

275. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

276. During her employment, Mars qualified for and received leave under the FMLA.

277. Upon taking her Intermittent FMLA Leave, Mars was retaliated against by being subjected to unsafe working conditions, more difficult tasks, harassment, and ultimately termination.

278. Dana willfully retaliated against Mars in violation of 29 U.S.C. § 2615(a).

279. Dana intentionally retaliated against Mars in violation of 29 U.S.C. § 2615(a).

The Employee's Attorney.™



280. As a direct and proximate result of Dana's wrongful conduct, Mars is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorneys' fees.

### COUNT VI: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

281. Mars restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

282. Under Ohio law, an employer may not terminate an employee if doing so would jeopardize a clear public policy and the employer has no overriding legitimate justification for the termination.

283. There is a clear public policy embodied in Ohio's statutes and constitution that favors workplace safety.

284. There is a clear public policy embodied in federal statutes that favors workplace safety.

285. From the issuance of the Government Mandate and the No Mass-Gathering Order, there was a clear public policy that required individuals and employers to prevent the spread of COVID-19.

286. During her employment, Mars made complaints that were consistent with the clear public policy favoring workplace safety.

287. During her employment, Mars made complaints that were consistent with the clear public policy that required individuals and employers to prevent the spread of COVID-19.

288. Terminating an employee for making complaints about workplace safety and the spread of illness jeopardizes those public policies.

289. Mars' Termination was motivated by her conduct consistent with the clear public policies favoring workplace safety and preventing the spread of COVID-19.

290. Mars' Termination jeopardizes those public policies.



291. Dana had no legitimate overriding justification for Mars' Termination.

292. As a result of Dana's wrongful termination of Mars in violation of public policy, Mars has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Mars to injunctive, equitable, and compensatory monetary relief.

293. As a result of Dana's wrongful termination of Mars in violation of public policy, Mars has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain suffering.

294. In its discriminatory actions as alleged above, Dana acted with malice or reckless indifference to the rights of Mars, thereby entitling Mars to an award of punitive damages.

295. To remedy the violations of the rights of Mars secured by public policy, Mars requests that the Court award her the relief demanded below.

### DEMAND FOR RELIEF

WHEREFORE, Mars demands from Dana the following:

(a) Issue an order requiring Defendants to restore Mars to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Mars for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Mars claims as allowable under law;

The Employee's Attorney.™



(e)  An award of the taxable costs of this action; and

(f)  An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

Brian D. Spitz (0068816)
Rocco J. Screnci (0100333)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email:  brian.spitz@spitzlawfirm.com
        rocco.screnci@spitzlawfirm.com

*Attorneys For Plaintiff Jacqueline Mars*



## **JURY DEMAND**

Plaintiff Jacqueline Mars demands a trial by jury by the maximum number of jurors

permitted.

Brian D. Spitz (0068816)

*Attorneys For Plaintiff Jacqueline Mars*

The Employee's Attorney.™



EEOC Form 161-B (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Jacqueline Mars<br>1109 Sherman Street<br>Toledo, OH 43608 | From: | Detroit Field Office<br>477 Michigan Avenue<br>Room 865<br>Detroit, MI 48226 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 471-2021-00542 | **Anthony Watts,**<br>**Investigator** | **(313) 226-4087** |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| [X] | More than 180 days have passed since the filing of this charge. |
|---|---|
| [ ] | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| [X] | The EEOC is terminating its processing of this charge. |
| [ ] | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| [ ] | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost. |
|---|---|
| [ ] | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Digitally signed by Deanna E. Wooten*

**Deanna E. Wooten**
*Date: 2021.06.02 14:44:28 -04'00'*

*For* **Michelle Eisele,**
**District Director**

June 2, 2021
*(Date Issued)*

Enclosures(s)

cc: | **Gary Golden**<br>**Sr. Director of Legal**<br>**DANA, INC.**<br>**3044 Jeep Parkway**<br>**Toledo, OH 43610** | **Kristen Fling**<br>**THE SPITZ LAW FIRM, LLC**<br>**The Employee's Attorney  - The WaterTower Plaza**<br>**25200 Chagrin Blvd.  Suite 200**<br>**Beachwood, OH 44122** |

Enclosure with EEOC

Exhibit A

Form 161-B (11/2020)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* **to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.